J-S25037-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: B.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., NATURAL MOTHER | : | No. 1846 MDA 2019 |

Appeal from the Order Entered October 11, 2019
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s):  Adoptee No. 25 of 2019

BEFORE:  LAZARUS, J., DUBOW, J., and KING, J.

MEMORANDUM BY KING, J.:          **FILED: JUNE 22, 2020**

Appellant, L.L. ("Mother"), appeals from the order entered in the Northumberland County Court of Common Pleas, Orphans' Court, which granted the petition of Children and Youth Services ("CYS") for involuntary termination of Mother's parental rights to her minor child, B.L. ("Child").[1]  We affirm.

The relevant facts and procedural history of this case are as follows. Child was born in December 2005.

> [CYS] first began receiving referrals regarding the minor child in 2013.  Concerns were substance abuse and mental health issues.  Mother was hospitalized for a serious attempt at suicide after an overdose of prescription medication. Ultimately, … Child was adjudicated dependent [on] November 15, 2013.  She remained in foster care placement

---

[1] The court also terminated the parental rights of father, K.L., who is not a party to the current appeal.

until March 4, 2015, when Maternal Grandmother and her uncle were granted permanent legal custodianship.

The next referral was in 2015 regarding [Child's] behavioral problems and another suicide attempt by natural mother.

The agency had at least four subsequent referrals in 2016 which included maternal grandmother/caretaker's inability to control [C]hild's behaviors, [C]hild acting aggressively, physical abuse of [Child], and lack of parenting ability. Additionally, … Mother was not involved with the child as she was hospitalized in Danville State Hospital, a mental health facility, for a year and a half and upon her discharge disappeared.

(Trial Court Opinion, filed January 14, 2020, at 1).

On February 27, 2018, CYS again placed Child in foster care. Thereafter, the court deemed Child dependent for a second time. CYS could not make contact with Mother until September 6, 2018. Although Mother then commenced regular visitation with Child, she failed to complete the objectives outlined in her permanency plan. Significantly, Mother did not provide CYS with any mental health records to demonstrate that she had sought treatment for her ongoing mental health issues.

On May 7, 2019, CYS filed a petition for involuntary termination of Mother's parental rights. The court conducted Mother's termination hearing on October 11, 2019. Mother, Child, and two CYS caseworkers testified at the hearing. At the conclusion of the hearing, the court determined Mother's inability to obtain appropriate mental health services rendered her incapable of providing essential parental care. Consequently, the court terminated Mother's parental rights. On November 8, 2019, Mother timely filed her notice

of appeal and concise statement of errors complained on appeal.

Mother now raises three issues for our review:

> WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT [CYS] PRESENTED CLEAR AND CONVINCING EVIDENCE THAT GROUNDS FOR INVOLUNTARY TERMINATION EXIST; SPECIFICALLY THAT [CYS] FAILED TO PRESENT ANY EVIDENCE OF MOTHER'S ALLEGED MENTAL HEALTH INFIRMITY DESPITE THE FACT AND PREMISE THAT HER MENTAL HEALTH WAS A PRIMARY BASIS OF THE ARGUMENT TO TERMINATE HER PARENTAL RIGHTS?

> WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE BEST INTERESTS OF THE CHILD WOULD BE SERVED BY TERMINATING PARENTAL RIGHTS?

> WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT ALTHOUGH [MOTHER] HAD VISITED CHILD AT VIRTUALLY EVERY OPPORTUNITY AVAILABLE TO HER DURING THE PENDENCY OF THE PHYSICAL PLACEMENT OF CHILD, THE COURT DENIED HER MOTION FOR A COURT ORDERED BONDING ASSESSMENT?

(Mother's Brief at 8).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order

- 3 -

> to determine whether the trial court's decision is supported by competent evidence.

> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYS filed a petition for the involuntary termination of Mother's parental rights to Child on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following

grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\* \* \*

23 Pa.C.S.A. § 2511(a)(2), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." ***In re Z.P., supra*** at 1117.[2]

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory

---

[2] CYS also sought the involuntary termination of Mother's parental rights under Sections 2511(a)(1), (5), and (8), but we need only analyze Section 2511(a)(2) for purposes of this appeal.

grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of …her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

In her first issue, Mother submits CYS relied on unsubstantiated hearsay and speculation to establish that Mother was involuntarily committed to a mental hospital. Mother also avers that CYS did not conduct a mental health evaluation in this case; instead, CYS impermissibly relied on its caseworkers to opine on Mother's mental health. Moreover, Mother asserts she did not know about Child's second dependency adjudication, and she cannot be culpable for her absence from Child's life throughout 2018. Mother concludes the trial court erroneously terminated her parental rights, because it lacked clear and convincing evidence of any mental health infirmity that renders her unable to parent. We disagree.

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). The fundamental test in termination of parental rights under Section 2511(a)(2)

was long ago stated in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

Instantly, Rachel Sahutsky, a CYS intake worker, testified that she was unable to locate Mother throughout her involvement in Child's case, which began in approximately April 2017. (*See* N.T. Termination Hearing, 10/11/19, at 15, 19). Lakenyia Taylor, Mother's CYS caseworker, testified that she spent more than two months working Child's case before she spoke with Mother. Upon initial contact on September 6, 2018, Mother told Ms. Taylor she was unaware Child had returned to foster care. (*Id.* at 22). Although Mother subsequently began regular visitation with Child, Ms. Taylor said the majority of conversations between Mother and Child resulted in arguments that Mother was unwilling or unable to resolve. (*Id.* at 31-34).

Further, Ms. Taylor testified that CYS's primary concern was Mother's mental health. Ms. Taylor described her observations of Mother's unstable mental state, including Mother's inability to carry a direct conversation and Mother's belief in unsupported claims that people were opening and resealing

her mail, "messing with her medication," and "breaking in[to] her home, [and] writing on the wall." (*Id.* at 23, 36). Significantly, on multiple occasions, Ms. Taylor explained to Mother that Mother needed to obtain a mental health evaluation as part of her permanency plan. (*Id.* at 24-25). Although Mother claimed to have obtained an evaluation, she refused to release any records to Ms. Taylor. (*Id.* at 26).

Child also testified at the hearing, reiterating that Mother denied having any mental health problems. (*Id.* at 7). However, as far as Child knew, Mother had not participated in the required mental health evaluation. (*Id.* at 5). Child also opined that Mother suffered from some form of mental illness: "[A]s I got older, I realized that, like, every time a boyfriend left was when [Mother] had to go to the hospital because that was when she tried to overdose." (*Id.* at 8). Based upon the foregoing, Child felt Mother's home would not be "stable" or "safe" for her. (*Id.* at 5). Child would not miss her Mother if the court opted for termination, "because [Mother] wasn't in [Child's] life for so long." (*Id.* at 6). Consequently, Child actually requested that the court terminate Mother's rights. (*Id.* at 4, 6).

CYS's final witness was Mother herself, who failed to provide direct responses for several of CYS's questions. (*Id.* at 52-57). Mother conceded she was hospitalized at Danville State Hospital, which treats individuals with mental health issues, "once…because of safety concerns." (*Id.* at 58). Mother also explained her refusal to release her medical records to CYS, claiming it

was an exercise of her "right to privacy." (*Id.* at 59).

Here, the witnesses' testimony confirmed Mother's sporadic and prolonged absences from Child's life. As the trial court explained, "the fact Mother can go from sometime in April 2017 until September of 2018 without contacting her child or the persons entrusted (who were family members) with her care, shows a complete and utter desertion of her parental duties." (Trial Court Opinion at 2). Even when Mother participated in regular visitation, she demonstrated an inability to peacefully communicate and resolve conflicts with Child.

Additionally, Mother failed to comply with her permanency plan objectives by refusing to provide proof of the completion of a mental health evaluation. On this record, the trial court correctly determined that CYS had presented clear and convincing evidence that Mother would not remedy the conditions that caused Child's placement. ***See In Interest of Lilley***, ***supra***. Therefore, Mother is not entitled to relief on her first claim. ***See In re Z.P.,*** ***supra***.

In her second and third issues, Mother contends the trial court erroneously denied her request for a bonding assessment. Absent such an assessment, Mother emphasizes that she frequently visited Child, and Child has admitted that she loves Mother. Mother insists these facts demonstrate a strong emotional bond that, if severed, would be deleterious to Child. Moreover, Mother suggests the court improperly relied on Child's testimony

about their relationship, considering her young age and the potential influence of self-serving caseworkers. Mother concludes the court should have ordered a bonding assessment to determine if termination is in Child's best interests. We disagree.

Under Section 2511(b), the court must consider whether termination will best serve the child's needs and welfare. *In re C.P.*, 901 A.2d 516 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* at 520 (internal citations omitted). Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have …her rights terminated." *In re B.L.L.*, 787 A.2d

- 10 -

1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of …her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

- 11 -

Instantly, Ms. Taylor admitted that Mother and Child love and care for each other. (**See** N.T. Termination Hearing at 42). Ms. Taylor acknowledged that Mother consistently visited with Child, and some sessions went well. However, Ms. Taylor also explained that the majority of visits resulted in arguments, often regarding trivial matters that Mother was unable or unwilling to resolve. In sum, Ms. Taylor described the bond between Mother and Child as more akin to friendship. (**Id.** at 43).

Further, Child testified that her contact with Mother before the termination hearing was often contentious. Child revealed that their arguments during phone calls and in-person visits tended to escalate to the point that the communication would end prematurely. Child expressed her preference for termination stating, "I love her because she is my mom, but … I don't want her to have rights of me." (**Id.** at 12).

In its analysis of Child's best interests, the trial court emphasized Child's testimony that she did not feel safe in Mother's home and wished for the termination of parental rights.[3] Despite Mother's argument that the trial court improperly denied her request for a bonding assessment, an assessment and expert opinion are not necessary for the court to conduct a bonding analysis. **See In Z.P., supra**. Although the court recognized the existence of some

---

[3] To the extent that Mother's argument can be construed as a challenge to Child's credibility, we defer to the trial court's determination regarding the weight of Child's testimony. **See In re Z.P., supra**.

bond, it found that the bond was not healthy and could be severed without a detrimental effect on Child. On this record, sufficient evidence supported the trial court's findings regarding Child's best interests, and Mother is not entitled to relief on her second and third issues. *Id.* Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/22/2020